IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ROBERT J. MILLER            PLAINTIFF

VS.            CIVIL NO. 06-5099

MICHAEL J. ASTRUE[1], Commissioner,
SOCIAL SECURITY ADMINISTRATION            DEFENDANT

**MEMORANDUM OPINION**

Robert Miller ("plaintiff"), brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration denying his application for disability insurance benefits ("DIB") under Title II of the Act.

**Background:**

The application for DIB now before this court was filed on August 27, 1999, alleging an onset date of March 10, 1998, due to hard metal pneumoconiosis. (Tr. 71-73, 84). An administrative hearing was held on September 12, 2000. (Tr. 27-49).

The ALJ issued a written decision on October 24, 2000, finding that plaintiff was not disabled within the meaning of the Act. (Tr. 9-21). Plaintiff sought review of the ALJ's decision in this court, and the case was reversed and remanded for further administrative proceedings on April 8, 2002. (Tr. 347-352). On remand, a supplemental administrative hearing was held on July 16, 2003. (Tr. 280-308).

---

[1]Michael J. Astrue became the Social Security Commissioner on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue has been substituted for Commissioner Jo Anne B. Barnhart as the defendant in this suit.

On August 26, 2003, the ALJ entered a second opinion finding plaintiff not to be disabled. (Tr. 356-369). In response to written exceptions filed by the plaintiff, the Appeals Council remanded the case back to the ALJ on June 22, 2005. (Tr. 384-390). A third administrative hearing was held on December 13, 2005. (Tr. 309-333). Plaintiff was present and represented by counsel.

The ALJ issued his final decision on February 1, 2006, found that plaintiff was insured for benefits through March 31, 2004. (Tr.276). He then concluded that plaintiff's hard metal pneumoconiosis was a severe impairment within the meaning of the Regulations but did not meet or medically equal an impairment contained in the Listing of Impairments in Appendix 1 to Subpart P of Regulations No. 4. (Tr. 276). As such, the ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform the exertional and non-exertional requirements of at least a wide range of light level work involving no more than occasional climbing, stooping, crouching, crawling, and kneeling and should avoid even moderate exposure to chemicals, dust, temperature extremes, fumes, and poor ventilation. (Tr. 275, 276). With the assistance of a vocational expert ("VE"), the ALJ then concluded that plaintiff could return to his PRW as a security guard in a BB gun manufacturing plant. (Tr. 275-277).

At the time of the ALJ's final decision, plaintiff was sixty-one years old and possessed a general equivalency degree with some college-level instruction. (Tr. 13, 268, 360). The record reveals that he had past relevant work ("PRW") experience as a security guard, grinding machine operator, and a receiving clerk/merchandise stocker. (Tr. 97-104, 283-288, 314-318).

Because the Appeals Council did not assume jurisdiction of the ALJ's decision, that decision became the final decision of the Commissioner on April 2, 2006. (Tr. 164-166). *See* 20 C.F.R. §§

404.894, 416.1484. Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. (Doc. # 6, 7).

**Evidence Presented:**

The medical records reveal that plaintiff has a history of chronic dyspnea. (Tr. 139). In March 1998, he was prescribed prednisone and inhaled bronchiodilaters, which resulted in some mild improvement. (Tr. 137, 209). However, a chest x-ray revealed increased interstitial markings, most prominently in the right upper lobe area. Dr. D. M. Halinski diagnosed plaintiff with chronic dyspnea with a recent change in his pulmonary functions showing some restricted defect and worsening interstitial infiltrates. He then ordered a pulmonary CT scan. (Tr. 137). The CT scan of plaintiff's chest showed bilateral apical pulmonary interstitial and miliary infiltrates. As such, an open biopsy of plaintiff's lung was recommended. (Tr. 134). In April 1998, plaintiff underwent a lung biopsy, which resulted in a diagnosis of hard metal pneumoconiosis due to chronic tungsten cobalt exposure. (Tr. 129, 132, 148-151). On May 12, 1998, Dr. D. M. Halinski indicated that plaintiff was "somewhat symptomatic but objective physiological measures" were still "fairly good." (Tr. 132). Based on pulmonary function testing, Dr. Halinski stated that plaintiff had minimal restrictive disease. (Tr. 132).

A chest x-ray dated May 19, 1998, revealed coarse interstitial opacities bilaterally, resolution of a right pneumothorax with interval removal of the right chest tube and right subclavia central lines, and a cardiac size within the upper limits of normal with no evidence of pleural effusion. (Tr. 131).

3

On May 12, 1998, Dr. Halinski indicated that although plaintiff was somewhat symptomatic, objective physiological measures were fairly good, and pulmonary function testing (PFT) showed "minimal" restrictive disease. (Tr. 132).

This same date, Dr. D. L. Friesen, an associate of Dr. Halinski's, reported that plaintiff could return to work on June 22 without restriction but did note that plaintiff appeared to have some breathing restrictions. (Tr. 130).

On August 11, 1998, Dr. Halinski noted that plaintiff had improved and was less dyspneic. (Tr. 127). However, plaintiff continued to experience shortness of breath with mild exertion. Dr. Halinski indicated that plaintiff's impairment was rated as a probable New York Heart Class II, at that time. As such, he recommended that plaintiff not return to work. Instead, he suggested pulmonary rehabilitation to help plaintiff try to build up his exercise tolerance. Dr. Halinski then referred plaintiff to Dr. Kyle Hardy, a pulmonologist. (Tr. 127).

Plaintiff was evaluated by Dr. Hardy at the Fayetteville Diagnostic Clinic on September 15, 1998. On examination, plaintiff's lungs were clear to auscultation with no wheezing or crackling. There were also no intercostal retractions. Pulmonary function study results were unchanged from February. Based on plaintiff's biopsy results, Dr. Hardy felt that steroids might be an effective treatment because of the potentially reversible nature of plaintiff's immature fibrosis. (Tr. 175-176). On September 22, 1998, he prescribed Prednisone and pulmonary rehabilitation. (Tr. 173). At this time, pulmonary diagnostic tests revealed extremely poor exercise tolerance with no evidence of a reduction in oxygen saturation. (Tr. 198).

On October 21, 1998, progress notes indicate that plaintiff was experiencing side effects of the Prednisone. (Tr. 171). He had gained 17.5 pounds and had an increased appetite. Plaintiff also complained of lower back pain and continued dyspnea. As such, Dr. Hardy reduced his Prednisone dosage. (Tr. 171).

On December 1, 1998, plaintiff continued to experience severe dyspnea with exertion. (Tr. 169). Although he was participating in pulmonary rehabilitation, he had gained three pounds. Plaintiff also complained of lower back pain. Dr. Hardy directed plaintiff to continue the Prednisone and advised him to consult with his primary care physician regarding his lower back pain. (Tr. 169).

Plaintiff reported to Dr. Hardy on January 8, 1999, that after three months of pulmonary rehabilitation and treatment, his dyspnea had decreased in frequency. (Tr. 167). Dr. Hardy noted that during an exercise pulse oximetry on December 29, 1998, plaintiff was able to exercise for 16 minutes without any significant desaturation, which was "greatly" improved from a previous study. Pulmonary function study results were unchanged, showing restrictive lung disease. Although Dr. Hardy concluded that there was minimal evidence of improvement, he indicated that plaintiff "certainly had better exercise tolerance." (Tr. 167-168). However, because plaintiff complained of atypical chest pain, he referred him to Dr. Johnson. He also continued plaintiff on Prednisone and recommended that he consult with the Mayo Clinic. (Tr. 168).

On January 18, 1999, plaintiff sought treatment for complaints of left-sided chest pain. (Tr. 206). Dr. Christopher Johnson diagnosed him with atypical chest pain and ordered a treadmill stress test. (Tr. 206).

On February 2, 1999, plaintiff underwent a treadmill stress test. (Tr. 205). It revealed no sign of coronary artery disease but did show that plaintiff seemed to be somewhat deconditioned and did have a hypertensive response to testing. He tolerated testing to a total of six minutes of exercise. (Tr. 205).

Plaintiff underwent spirometry, lung volumes, and diffusion capacity testing at Washington Regional Medical Center on April 8, 1999. (Tr. 185-186). Dr. Jon A. Sexton reported that the test results showed a borderline to mild obstructive defect with possible mild restrictive defect. Lung volumes were mildly reduced and diffusion was borderline reduced. There was no significant desaturation with moderate exercise. (Tr. 185-190).

Plaintiff followed-up with Dr. Hardy on April 9, 1999, and reported no subjective improvement. (Tr. 164). Dr. Hardy reported that plaintiff's pulmonary function studies showed minimal improvement in forced vital capacity (FVC) and total lung capacity since beginning Prednisone therapy. He also noted improvement in plaintiff's exercise pulse oximetry. (Tr. 164). A chest x-ray revealed probable cardiomegaly with bilateral interstitial infiltrates. (Tr. 166). Dr. Hardy reduced plaintiff's Prednisone dosage, asked him to consult with Dr. Johnson concerning his lower extremity pain, referred plaintiff to the Mayo Clinic for additional treatment, and directed plaintiff to return for a follow-up in three months. (Tr. 165).

Spirometry testing on July 12, 1999, was reported by Dr. Gary L. Templeton to show mild restrictive lung disease. (Tr. 182-183).

On July 23, 1999, plaintiff reported no real improvement in his symptoms. (Tr. 163). A physical exam revealed clear lungs with no wheezes or crackles. Spirometry results indicated some

improvement when compared to studies performed in September 1998. Dr. Hardy indicated that it was difficult to determine whether or not the Prednisone had really had much of an effect on plaintiff's condition. As such, he directed him to reduce his Prednisone dosage for one week and then stop it entirely. (Tr. 163).

On October 19, 1999, Dr. Hardy indicated that plaintiff had tapered off his Prednisone dosage and had noticed no change in his baseline dyspnea. (Tr. 157). Further, plaintiff reported that he had tried to fish, hunt, play golf, and bowl, but had been unable to do so due to his dyspnea. As a part of his pulmonary rehabilitation, plaintiff was walking on a treadmill 16 to 20 minutes and riding a bicycle for 20 minutes.

On examination, plaintiff's lungs were clear to auscultation with no wheezes or crackles. (Tr. 157). Spirometry tests performed at this time revealed mild restrictive lung defect. There was also a moderate reduction in mid flow rates which improved after bronchiodilator therapy, moderate reduction in total lung capacity, moderate reduction in residual volume, and mild reduction in diffusion capacity. Further, chest x-rays revealed borderline cardiomegaly with extensive bilateral interstitial infiltrates. (Tr. 159). Dr. Hardy concluded that plaintiff had reached his maximum medical improvement and that he could probably tolerate a desk job which involved minimal activity. (Tr. 157-162).

Plaintiff underwent a pulmonary evaluation by Dr. Nancy F. Rector at the Little Rock Pulmonary Clinic on January 19, 2000. (Tr. 486-487). Dr. Rector agreed with the diagnosis of hard metal pneumoconiosis and concluded that plaintiff was unable to return to his previous job. Although she determined that he could not perform a job that required significant physical exertion,

she was of the opinion that he could return to gainful employment in a sedentary office type job. Per the AMA guidelines, Dr. Rector rated plaintiff's disability as 10 to 25 percent mild impairment of the whole person. (Tr. 486- 487).

On June 20, 2000, plaintiff had a follow-up appointment with Dr. Hardy. (Tr. 259). He reported that he had to purchase a riding lawn mower because he could no longer use a push mower. Plaintiff was still able to participate in pulmonary rehabilitation and was able to walk on a treadmill and ride a bicycle for 18 to 20 minutes. A physical examination was unchanged. However, spirometry showed significant improvement over the previous study completed in October 1999. Dr. Hardy concluded that plaintiff's condition was stable as best he could tell. (Tr. 259-261).

On September 7, 2000, Dr. Johnson completed a long-term disability claim physician's statement. (Tr. 262-263). He indicated that plaintiff was unable to work, due to hard metal pneumoconiosis. Dr. Johnson stated that plaintiff should not be exposed to extremes of temperature and was unable to lift or perform strenuous activities. (Tr. 263).

Chest x-rays dated July 11, 2001, revealed cardiomegaly and chronic interstitial lung disease. (Tr. 469).

Plaintiff was evaluated at the Veterans Administration (VA) on May 16, 2002. It was noted that plaintiff had done well and had refused any medications such as inhalers and medication to control his hyperlipidemia. On examination, plaintiff's lungs were clear to auscultation without rales or wheezes. (Tr. 509-511).

AO72A
(Rev. 8/82)

On January 17, 2003, plaintiff underwent further spirometry testing. (Tr. 428). Dr. Sexton diagnosed him with a mild to moderate restrictive defect with mild to moderate air flow obstruction in the small airways. (Tr. 428-432).

Plaintiff was evaluated by Dr. Ayman Bakleh on March 11, 2003. After conducting a physical exam, Dr. Bakleh diagnosed him with dyspnea with exertion resulting from pneumoconiosis from hard metal; chest pain which was non specific and atypical for coronary artery disease and probably muscular in nature; well controlled hypertension; and, irritable bowel syndrome. (Tr. 433). A chest x-ray was normal. (Tr. 434). Therefore, Dr. Bakleh concluded that plaintiff could occasionally lift/carry 20 to 100 pounds and frequently lift/carry up to 20 pounds. He also determined that plaintiff could sit up to 8 hours uninterrupted; stand 7 hours total, 3 hours uninterrupted; and, walk 4 hours, less than one hour uninterrupted in an 8 hour workday. There were no noted limitations concerning plaintiff's hands or feet, although the doctor did state that plaintiff experienced occasional finger cramps. (Tr. 437). Dr. Bakleh also found that plaintiff could only occasionally climb, stoop, crouch, and kneel; frequently crawl, reach, handle, feel, push/pull, hear and speak; and, continuously balance. In addition, he imposed environmental restrictions against chemicals, dust, temperature extremes, heat, and fumes. (Tr. 433-440).

**Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be

affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving him disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past

relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920 (2003).

**Discussion:**

In plaintiff's appeal brief, plaintiff argues that the ALJ erred by failing to give credibility to his subjective complaints, disregarding the opinions and findings of the primary treating physician, and finding that plaintiff can perform light work. (Doc. # 6). However, after reviewing the entire record, we find that the ALJ's decision is supported by substantial evidence.

We first address the ALJ's assessment of plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id*. As the United States Court of Appeals for the Eighth Circuit recently observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

11

After reviewing the record, we believe that the ALJ adequately evaluated the factors set forth in *Polaski*, and conclude there is substantial evidence supporting his determination that plaintiff's complaints were not fully credible. The testimony presented at the hearing as well as the medical evidence contained in the record are inconsistent with plaintiff's allegations of disability.

The record currently before the court reveals that plaintiff has been diagnosed with hard metal pneumoconiosis and has sought consistent treatment for this condition. (Tr. 129). However, plaintiff's medical records indicate that his lung impairment was mild, immature, and reversible. (Tr. 157-162, 175-176, 182-183, 185-190, 428-432). Pulmonary function testing results have also documented improvement in plaintiff's condition since 1998. (Tr. 163, 164, 259-261). In fact, by June 2000, Dr. Hardy concluded that plaintiff's condition had stabilized.[2] (Tr. 259-261). *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (holding that a condition that can be controlled or remedied by treatment cannot serve as a basis for a finding of disability).

Additionally, plaintiff underwent only conservative treatment for this impairment, consisting of steroid medication and pulmonary rehabilitation. *See Gowel v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding fact that physician prescribed conservative treatment weighed against plaintiff's subjective complaints). In July 1999, Dr. Hardy discontinued this medication. (Tr. 163). There is no evidence to suggest that discontinuing this medication resulted in a deterioration of plaintiff's lung functioning. Further, in May 2002, plaintiff refused medication to help alleviate his alleged shortness of breath. (Tr. 509-511). *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001)

---

[2] Although outside the relevant time period for this case, we also note that plaintiff returned to full-time work in March 2005. (Tr. 317-318).

(holding that claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain). Had plaintiff's condition been as severe as alleged, we believe his condition would have worsened after discontinuing the steroids and he would not have refused further medication.

We also note that plaintiff has been treated for hypertension, as well as chest and lower back pain. However, he did not seek consistent treatment for these conditions. *See Novotny v. Chater*, 72 F.3d 669, 671 (8th Cir. 1995) (per curiam) (failure to seek treatment inconsistent with allegations of pain). In fact, a treadmill stress test revealed no sign of coronary artery disease. (Tr. 205). As such, plaintiff was diagnosed with atypical and non-cardiac chest pain. Dr. Bakleh even opined that plaintiff's chest pain was likely muscular in nature. (Tr. 433). Further, plaintiff took medication to control his blood pressure, which Dr. Bakleh noted to be well controlled. (Tr. 433). *See Roth*, 45 F.3d at 282. As such, there is simply no evidence to indicate that these conditions had a negative impact on plaintiff's ability to perform work-related activities.

Plaintiff's own reports concerning his activities of daily living also contradict his claim of disability. On his supplemental interview outline, plaintiff reported an ability to care for his personal hygiene, do laundry, wash dishes, change sheets, vacuum/sweep, take out the trash, mow the lawn, go shopping for groceries and clothes, go to the post office and bank, prepare 8 to 9 meals per week, drive familiar and unfamiliar routes, use public transportation, watch television, listen to the radio, read, and visit friends and relatives. (Tr. 105-106). Further, in December 2005, plaintiff was reportedly able to play golf. (Tr. 321). The record also shows that plaintiff mowed his lawn with a push mower up until June 2000, when he purchased a riding lawn mower. (Tr. 259). Moreover,

in March 2005, plaintiff returned to full-time work at Wal-Mart stocking shelves and unloading trucks. (Tr. 317-318). *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).

With regard to the testimony of plaintiff's sister, the ALJ properly considered her testimony but found it unpersuasive. This determination was well within the ALJ's province. *See Siemers v. Shalala*, 47 F.3d 299, 302 (8th Cir. 1995); *Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993).

Therefore, although it is clear that plaintiff suffers from some degree of pain and discomfort, he has not established that he is unable to engage in any and all gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Neither the medical evidence nor the reports concerning his daily activities supports plaintiff's contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

Although plaintiff argues that the ALJ did not set forth reasons in the decision for discounting his credibility, the ALJ did acknowledge his duty to consider all alleged symptoms in accordance with the factors set forth in 20 C.F.R. § 404.1520 and *Polaski.* (Tr. 269). He also found that plaintiff's subjective allegations were not totally credible when considered in light of the entire record. (Tr. 275). This is a sufficient credibility finding. Contrary to plaintiff's contention, however, the ALJ is not required to explicitly discuss each *Polaski* factor. *See Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) (holding that if the ALJ discredits plaintiff's credibility and gives a good reason for doing so, the court will defer to his judgement even if every factor is not discussed in depth).

Plaintiff also contends that the ALJ erred in finding that he maintained the RFC to perform a range of light work. It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). The United States Court of Appeals for the Eighth Circuit has also stated that a "claimant's residual functional capacity is a medical question," *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000), and thus, "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam ), must support the determination of the plaintiff's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Nevland v. Apfel*, 2 04 F.3d 853, 858 (8th Cir. 2000). Therefore, in evaluating the plaintiff's RFC, *see* 20 C.F.R. § 404.154599(c), while not limited to considering medical evidence, an ALJ is required to consider at least some supporting evidence from a professional. *Cf. Nevland v. Apfel*, 204 F.3d at 858; *Ford v. Secretary of Health and Human Servs.*, 662 F. Supp. 954, 955, 956 (W.D.

Ark. 1987) (RFC was "medical question,"and medical evidence was required to establish how claimant's heart attacks affected his RFC).

In the present case, the ALJ considered the medical assessments of non-examining agency medical consultants, a general physical examination, plaintiff's subjective complaints, and his medical records. On September 21, 1999, a non-examining, consultative physician completed an RFC assessment of plaintiff. (Tr. 249-257). After reviewing plaintiff's medical records, the doctor concluded that he could lift 25 pounds frequently and 50 pounds occasionally, as well as sit, stand, and walk about six hours during an eight-hour workday. (Tr. 250). The doctor noted no other limitations, aside from the fact that plaintiff would need to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 253).

Further, in March 2003, Dr. Bakleh concluded that plaintiff could occasionally lift/carry 20 to 100 pounds and frequently lift/carry up to 20 pounds. He also determined that plaintiff could sit up to 8 hours uninterrupted; stand 7 hours total, 3 hours uninterrupted; and, walk 4 hours, less than one hour uninterrupted in an 8 hour workday. There were no noted limitations concerning plaintiff's hands or feet, although the doctor did state that plaintiff experienced occasional finger cramps. (Tr. 437). Dr. Bakleh also found that plaintiff could only occasionally climb, stoop, crouch, and kneel; frequently crawl, reach, handle, feel, push/pull, hear and speak; and, continuously balance. In addition, he imposed environmental restrictions against chemicals, dust, temperature extremes, heat, and fumes. (Tr. 433-440).

While we do note that plaintiff's treating physician, Dr. Johnson did state that plaintiff could only perform sedentary work, we can find nothing in the record to support his opinion. In fact,

16

plaintiff's pulmonary function tests showed significant improvement. Further, his lung impairment was noted to be only mild, as well as immature and reversible. Based on the activities plaintiff reported an ability to perform, as well as his performance in pulmonary rehabilitation, we do not believe that the ALJ erred in failing to assign Dr. Johnson's opinion controlling weight.

Further, Dr. Rector's opinion that plaintiff could perform sedentary work is not necessarily contrary to the ALJ's RFC assessment. We note the Dr. Rector indicated that plaintiff could not perform a job that required significant physical exertion. (Tr. 486-487). Light work involves lifting no more than 20 pounds at a time with frequent lifting or carry of objects weighing up to 10 pounds. 20 C. F. R. §§ 404.1567, 416.967; *see also* SSR 83-10 (1983). Clearly, light work does not involve significant physical exertion. As such, we do not find Dr. Rector's opinion to be in direct conflict with the ALJ's RFC assessment.

We also find that substantial evidence supports the ALJ's finding that plaintiff can still perform work that exists in significant numbers in the national economy. When presented with a hypothetical by the ALJ involving a claimant of the same age, educational and vocational background as plaintiff, who could occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; stand and/or walk 6 hours out of an 8 hour workday (one hour without interruption); sit for 6 hours out of an 8 hour workday; must avoid moderate exposure to chemicals, dust, temperature extremes, fumes and poor ventilation; and, could only occasionally climb, stoop, crouch and kneel, the vocational expert testified that the individual would still be able to perform plaintiff's PRW as a security guard. (Tr. 331, 332). *See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996). Accordingly, we find substantial evidence to support

17

the ALJ's determination that plaintiff could still perform work that exists in significant numbers in the national economy.

**Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

ENTERED this 10th day of April 2007.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)